ORDERED.

Dated:  July 18, 2022

_____
Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: ) | Case No. 6:19-bk-05398-LVV |
| ) | Chapter 7 |
| J.E.L. Site Development, Inc., ) | |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| Gene T Chambers, as Chapter 7 Trustee, ) | |
| ) | Adv. No. 6:21-ap-00035-LVV |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| Delta Partnership LLC, et al, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Trustee seeks to avoid prepetition transfers[1] from J.E.L. Site Development, Inc. ("Debtor") to Delta Partnership LLC ("Delta") made within one year of Debtor's bankruptcy and to recover these funds from James E. Lucas, III,[2] Sadique Jaffer, and Ashu Luthra. The Court conducted

---

[1] The Trustee alleges the transfers are avoidable as preferential or fraudulent transfers. Doc. No. 1.
[2] By joint stipulation filed on May 31, 2022, the Trustee and James E. Lucas, III stipulated to his dismissal from this proceeding without prejudice. (Doc. No. 45).

a trial solely on the issue of Delta's insider status.[3] The Trustee asserts Delta was a statutory insider of Debtor as an affiliate pursuant to § 101(31)(E) of the Bankruptcy Code[4] based on Lucas' common ownership/control of the companies and/or a non-statutory insider based on the closeness of the relationship between Debtor and Delta. Having considered the evidence and applicable law, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Debtor was a construction site preparation company and a self-described family-owned business.[5] Debtor filed for Chapter 11 bankruptcy on August 16, 2019.[6] Father and son, James E. Lucas, Sr. ("Senior") and James E. Lucas, III ("Lucas"), were identified as Debtor's president/owner and vice president respectively on Debtor's bankruptcy filings.[7] There is some ambiguity as to who was the exact owner and president of Debtor during the transactions at issue (which ultimately does not impact the insider analysis).[8] But it is clear, at a minimum, Lucas ran the company with Senior,[9] was an officer of Debtor, was responsible for making financial decisions for Debtor, and was directly

---

[3] At a pretrial conference, Trustee's counsel made an *ore tenus* motion for a bi-furcated trial limited to a determination of Delta's insider status (Doc. No. 24) which the Court granted (Doc. No. 25).
[4] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et seq*.
[5] Trustee's Ex. 12.
[6] *Id.* The case was subsequently converted to Chapter 7 in July 2020.
[7] Trustee's Ex. 12, 13, and 14.
[8] This is because Debtor did not always follow corporate formalities. Various documents of Debtor are signed or refer to "James E. Lucas," a name both Lucas and Senior have used and some of Debtor's documents were signed by Lucas as president, though he asserts he did not hold that role at the time. *See* Trustee's Exs. 2, 3, 10. Debtor's corporate filings with the Florida Secretary of State for 2010, 2012, 2013, 2014-2019 reflect this ambiguity. Debtor's 2010 filings (filed by "James E. Lucas, III") show "Lucas, James E. Sr." as president, and "Lucas, James E. III" as vice president and registered agent. Debtor's 2012 filings show a change of registered agent from "Lucas, James E. III" to "Lucas, James E. Sr." Debtor's 2013 filings show a change of registered agent and president from "Lucas, James E. Sr." to "Lucas, James E." Debtor's 2014 – 2019 filings reflect no further changes, and accordingly list "James E. Lucas" as Debtor's president. Trustee's Ex. 2.
[9] Trustee's Ex. 10, p. 22:5–21. Lucas testified he and Senior ran Debtor together though he did not have legal ownership. He testified in years past he was an owner of Debtor, but he was not sure of the dates and times. No documents were produced indicating a transfer of ownership between family members and Lucas did not know if there were any documents that show who owned what at any given time.

involved in Debtor's day-to-day operations.[10] Further, Lucas was Debtor's only underground utility license holder (*i.e.*, its qualifying agent or "qualifier") and without him the business could not operate.[11]

From March 2019 through the petition date, Debtor transferred $450,000 to Delta as detailed below (the "Transfers"):

```
3/06/19 – Debtor check 31370 payable to Delta:    $100,000
3/29/19 – Debtor check 1002 payable to Delta:     $100,000
4/30/19 – Debtor wire transfer to Delta:          $100,000
5/31/19 – Debtor check 10323 payable to Delta:    $50,000
6/24/19 – Debtor check 10325 payable to Delta:    $50,000
7/17/19 – Debtor wire transfer to Delta:          $25,000
8/06/19 – Debtor wire transfer to Delta:          $25,000
```
[12]

Debtor transferred $150,000 to Delta within 90 days of the petition date. Debtor transferred the remaining $300,000 to Delta within one year of the petition date, but outside the 90-day preference period for non-insiders.

Sadique Jaffer and Ashu (Bobby) Luthra are real estate developers and regular business partners who own land through various entities. They formed Delta to receive the Transfers from Debtor.[13] The Transfers represent commissions for site development jobs they obtained for Debtor.[14] Jaffer and Luthra were good friends with Lucas, who was their contact at Debtor.[15] They started working with Debtor when it was the low bidder on one of their projects. Jaffer was satisfied with

---

[10] On Debtor's motion for authority to compensate officers and insiders of Debtor, Lucas and Senior had identical duties listed, which were in substance to run the company. Trustee's Ex. 13.

[11] Trustee's Ex. 19.

[12] Trustee's Ex. 18.

[13] Delta only did business with Debtor (other than perhaps brokering the occasional sale of dirt). Trustee's Ex. 11, p. 65:8–25; Trustee's Ex. 9, p. 14:7–20. Delta's 2019 tax return reflects that it only received income from Debtor. Defendants' Ex. 6.

[14] These commissions were for "consulting" on Delta's general ledger. Trustee's Ex. 21.

[15] Trustee's Ex. 9, p. 16:19–22. Jaffer estimated he knew Lucas at least 10 years while Luthra stated it was "many" years.

the work and from that point on they "established a trust and a friendship."[16] As the relationship progressed, the parties came up with an arrangement that Debtor would pay Delta a commission for getting it jobs. Jaffer and Luthra described the arrangement with Debtor as follows: when one of their entities sold land to a builder, they would condition the sale on (or strongly encourage) the builder hiring Debtor to perform the site work based on a competitive bid.[17] In return, they requested Debtor pay a commission to Delta. According to Jaffer and Luthra they were entitled to a share of the profit for bringing Debtor to the table for $15-20 million in projects. Jaffer handled the legal and accounting side of the business while Luthra made the arrangements with Lucas/Debtor for the commissions.

Jaffer and Luthra both sat for Rule 2004 examinations conducted by a creditor in February 2020 before the Trustee initiated this adversary proceeding. There, they both testified Lucas was or may have been a member in Delta.[18] Jaffer was more certain and said that he, Luthra, and Lucas were partners of Delta.[19] He testified the intent was for them to split the payments that came in from Debtor three ways, but because Debtor never had sufficient cash flow, he did not think Lucas ever received anything.[20] At trial, Jaffer explained he misspoke and if it was his intention that Lucas be a partner in Delta, that never materialized. At trial, Luthra also confirmed that despite his earlier uncertainty, Lucas never was a member of Delta and never received any money from Delta. Both Jaffer and Luthra cited their involvement in almost a hundred LLCs for their earlier confusion. They both recalled a conversation after the fact where Luthra told Jaffer it would not make any sense for Lucas

---

[16] Specifically, with respect to the relationship at his Rule 2004 Examination, Jaffer stated "The project was finished earlier, no change order, and from that point on, I said being in land development, it's very difficult to find contractors who are that honorable, we established a trust and a friendship. And from that point on, we didn't need too many agreement[s]. It was a handshake, it was an understanding, it was helping a friend, and helping each other. That's the relationship we had." Trustee's Ex. 9, p. 17:19–18:1.

[17] Lucas testified he would still have to interview with the builder, but that Jaffer and Luthra essentially vouched for Debtor.

[18] Trustee's Ex. 9, p. 12–8; Trustee's Ex. 11, p. 56:4–12.

[19] Trustee's Ex. 9, p. 12:2–8.

[20] *Id.*, p. 13:7–14:6.

4

to be a partner of Delta or receive any payments from Delta because Lucas already benefitted from Debtor being hired. Delta's organizational documents, business records, and tax documents do not reflect Lucas had an interest in Delta or received any transfers from Delta.[21] Lucas testified at trial he was never a member of Delta and received no benefit from Delta other than the site contracting jobs for Debtor.

There was no written agreement between Debtor and Delta concerning the commissions (even though Jaffer and Luthra apparently had written agreements with the site development company Lucas formed later). Jaffer testified the arrangement was a verbal agreement based on trust—as a friend—that, as he understood it, did not have any obligations. There was no particular methodology for determining the amount of any commission or when it was due to be paid. Rather, when Debtor had sufficient cash flow, it would pay Delta. There was no enforcement mechanism if Debtor did not pay.[22] At trial, Luthra further explained the deal mechanics. Delta would receive a cut of Debtor's profit margin on the site work if they wanted to get the job, which he negotiated with Lucas. Arriving at the amount was more art than science and based on what Luthra felt was fair. Delta's general ledger list debits of $200,000; $600,000; and $150,000 for commissions due from Debtor dated "01/01/2019," "03/01/2019," and "06/03/2019" respectively, totaling $950,000.[23] Luthra testified he thought there may have been invoices corresponding to these entries which he may have given Lucas

---

[21] Defendants' Exs. 1, 2, 3, 4, 6, 7, 8, and 10. Delta's operating agreement, which is dated February 2019, reflects Jaffer and Luthra each held a 50 percent interest in the company. Luthra subsequently transferred his membership interest in Delta to his daughter. Defendants' Ex. 6.

[22] At Jaffer's Rule 2004 examination when asked if Delta would receive a check from Debtor after it secured a project for Debtor to do site work, he stated, "There was no particular methodology or agreement. This understanding is merely a shake of hand based on trust. There is no written agreement. It's a verbal agreement that didn't have any obligations. It was when and if they had the money, they would pay us, and there was no time restriction. And if they didn't pay, there was no enforcement." Jaffer explained he thought there was an amount for each project, but that the negotiation was between Lucas and Luthra. His job was to distribute the money. Trustee's Ex. 9, p. 12:11–13:2. At trial, Jaffer confirmed this was his understanding.

[23] Trustee's Ex. 21.

when he met him at the bar (or elsewhere), but he did not have copies.[24] There was no clear testimony at trial concerning what particular projects these commissions corresponded to other than an example of getting a job for a builder such as KB Homes or Lennar. Per Delta's general ledger, Debtor still owed Delta $500,000 in commissions, which were written off as "bad debt" at the end of 2019.[25] Delta did not file a claim in Debtor's bankruptcy, nor did Debtor schedule Delta as a creditor.

      Notwithstanding their earlier confusion about whether Lucas was a partner in Delta, Jaffer and Luthra confirmed their Rule 2004 testimony at trial that they were good friends with Lucas. Specifically, Luthra and Lucas were "good drinking buddies" and their families spent time together, including at Luthra's beach house.[26] Debtor also donated $20,000 to charitable organizations that Jaffer and Luthra were involved with from 2017 to 2019.[27] Jaffer's nephew worked for Debtor and Lucas' new site development company.[28] In the lead up to Debtor's bankruptcy, Jaffer and Luthra encouraged Lucas to start a new site development business,[29] which Lucas did in July 2019. Jaffer and Luthra offered Lucas office space for the business rent free (at least initially), which Lucas ultimately declined.[30] Jaffer and Lucas then helped Lucas' new entity, Lucas Site Development, get

---

[24] Per a March 2020 email, Jaffer and Luthra's counsel asked them for copies of the invoices referenced on Delta's general ledger which were the subject of a request for production following their Rule 2004 examinations. Trustee's Ex. 17. No copies of the invoices are in the record.

[25] Trustee's Ex. 21.

[26] Luthra clarified he spent time with Lucas' family, meaning Lucas' wife and children (not Lucas' parents). At his Rule 2004 examination, Luthra stated with respect to his relationship with Lucas, "As his -- a good drinking buddy and his friend of mine for so many years, and he comes and hangs out with me. He comes to my house. He's my family friend. His wife comes to my beach house and stays there. He brings his kids over. … He[]'s my buddy. He's our friend so whatever we can do to help him out we're -- …-- trying to give him -- help him out. He's a very good friend of mine. He's a very close friend of mine and I consider him a very close friend, him and his family, and so whatever we can do to help him out, we do." Trustee's Ex. 11, p. 38:8–39:16.

[27] Trustee's Ex. 14, p. 59–60.

[28] Additionally, for at least some projects Debtor did for Jaffer and Luthra, they did not collect a lien waiver when they paid Debtor. Trustee's Ex. 9, p. 34:7–13.

[29] Trustee's Ex. 11, p. 70:2–25. Luthra indicated he spoke with Lucas multiple times a week as Debtor experienced increasing difficulties leading up to its bankruptcy.

[30] Jaffer testified at trial he offered the office space for Lucas' new business after the Transfers. As with Jaffer and Luthra's efforts to get Lucas' new business site development work (which also seem to have largely occurred after the Transfers), the Court only considers these actions to the extent they are indicative of the extent of the relationship Debtor and Delta had during the Transfers.

jobs for site development work. Jaffer and Luthra testified they did this despite Debtor's unpaid commissions to Delta because Lucas was their friend.

## Conclusions of Law

The Trustee advances two theories for holding that Delta was an insider of Debtor. The Trustee argues Delta (1) was a statutory insider of Debtor under § 101(31)(E) of the Bankruptcy Code and/or alternatively (2) was a non-statutory insider. "Under bankruptcy law, 'insider' is a flexible term. Rather than defining it, the Bankruptcy Code gives non-exclusive examples." *Salkin v. Chira (In re Chira)*, 353 B.R. 693, 724 (Bankr. S.D. Fla. 2006). The examples specifically enumerated in the code are referred to as "statutory insiders." *In re Island One, Inc.*, 6:10-BK-16177-KSJ, 2013 WL 652562, at *2 (Bankr. M.D. Fla. Feb. 22, 2013). For corporate debtors, an "insider" includes a director, officer, person in control, or partner of the debtor, in addition to a relative of any of these individuals. 11 U.S.C. § 101(31)(B). An "insider" also includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor," which as defined by § 101(2)(B), includes corporations with common ownership or control. 11 U.S.C. §§ 101(31)(E), 101(2)(B).

Because the Bankruptcy Code's definition of an "insider" is not exhaustive, insider status also applies to parties "whose close relationship with the debtor subjects any transactions made between the debtor and such entity to heavy scrutiny." *Miami Police Relief & Pension Fund v. Tabas (In re The Fla. Fund of Coral Gables, Ltd.),* 144 F. App'x 72, 75 (11th Cir. 2005) (quoting Collier on Bankruptcy P 101.31 at 101-99 (Revised 15th ed. 1996)). Such parties are referred to as non-statutory insiders. *In re Island One, Inc.*, 6:10-BK-16177-KSJ, 2013 WL 652562, at *2. "[N]on-statutory insider status [is] determined by a factual inquiry into the Debtor's relationship with the alleged insider. The determination is fact-intensive and must be made on a case-by-case basis." *Id.* (citing *Browning Interests v. Allison*, 955 F.2d 1008, 1011 (5th Cir. 1992); *In re DBSI, Inc.*, 445 B.R. 344,

348 (Bankr. D. Del. 2011)). The relevant time for the "insider" analysis is at the time the transfers were made, which in this case is March to August 2019. *See Gordon v. Sec. Essentials, Inc. (In re Alpha Protective Servs.)*, 570 B.R. 897, 908 (Bankr. M.D. Ga. 2017).

### (A) Delta is not a statutory insider of Debtor

The Trustee argues Delta was a statutory insider of Debtor as an affiliate under § 101(31)(E) based on Lucas' common ownership/control of Debtor and Delta. Under § 101(2)(B), an affiliate (and thus an insider) is a corporation in which 20 percent or more of its outstanding voting securities are owned or controlled by the debtor or an entity that owns or controls 20 percent or more of the stock of the debtor (either directly or indirectly).[31] Stated differently, businesses with common ownership are affiliates, and therefore insiders of each other. *In re Nilhan Devs., LLC,* No. 15-58443-WLH, 2021 WL 1539354, at *21 (Bankr. N.D. Ga. Apr. 19, 2021). Here, the Trustee asserts Lucas is that common owner, making Delta an insider of Debtor. According to the Trustee, Delta is an affiliate of Debtor because Lucas owns or controls at least 20 percent of both companies. The Trustee argues these criteria are met because Lucas had sufficient control over Debtor as its qualifying agent and Lucas was a member of Delta. This argument fails. Assuming Lucas had sufficient control/ownership over Debtor, the Court finds the Trustee has not proven Lucas was a member of Delta.

The Trustee's argument focuses on Jaffer and Luthra's prior Rule 2004 testimony that Lucas was or may have been a partner in Delta. The Trustee acknowledges that Delta's business records, tax documents, operating agreement, and articles of organization do not reflect Lucas' involvement in Delta as a member, manager, or otherwise. However, the Trustee asserts that the Rule 2004

---

[31] The Bankruptcy Code definition of a "corporation" under § 101(9) includes LLCs. *In re Nilhan Developers, LLC*, 620 B.R. 385, 400 (Bankr. N.D. Ga. 2020) (citing *Sherron Assocs. Loan Fund XXI (Lacey) L.L.C. v. Thomas (In re Parks)*, 503 B.R. 820, 829 (Bankr. W.D. Wash. 2013)).

testimony should be given more weight because the examination took place before this adversary proceeding was initiated and before Defendants could contemplate its impact. The Trustee highlights that Jaffer's prior testimony not only was clear that he originally intended for Lucas to be a partner in Delta but that he was specific as to how profits would be split between the partners (1/3 each) and why no payments were made to Lucas (Debtor had a shortfall and continued to owe Delta money). Last, the Trustee notes that Delta's operating agreement was filed eight months after the company was formed, and accordingly does not reflect the parties' original intent to have Lucas as a member, which changed when the parties signed the document.

The Rule 2004 testimony and other circumstantial evidence are not enough to establish that Lucas was a member. While the parties may have contemplated including Lucas as a member of Delta, what matters is who the members were from March to August 2019. Delta's operating agreement was signed in February 2019, shortly before the receipt of the first payment from Debtor and reflects Luthra and Jaffer as its sole members. No changes were made to the membership structure of Delta, other than Luthra conferring his interest to his daughter. There is also no evidence that Lucas had any role in the management of Delta or received any income from Delta. The Trustee has not met its burden and the Court finds Lucas is not a member of Delta and therefore Delta is not an insider under § 101(31)(E). Nevertheless, the Court finds Delta is a non-statutory insider.

**(B) Delta is a non-statutory insider of Debtor**

In the Eleventh Circuit, courts focus on two factors when determining non-statutory insider status. They are "(1) the closeness of the relationship between the transferee and the debtor, and (2) whether the transaction between the parties was conducted at arm's length." *Florida Fund of Coral Gables*, 144 F. App'x at 75, (citing *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992)); *In re Island One, Inc.*, 6:10-BK-16177-KSJ, 2013 WL 652562, at *2; *Stermer v. Old Republic Nat'l Title Ins. Co.*

*(In re ATIF, Inc.)*, Nos. 2:17-bk-01712-FMD, 2:18-ap-531-FMD, 2021 Bankr. LEXIS 3297, at *32 (Bankr. M.D. Fla. Dec. 2, 2021).[32] These factors get at the "core concern addressed by classifying certain entities as insiders," which is that insider creditors are more likely to get favorable treatment from debtors than non-insider creditors. *Ogier v. Johnson (In re Healing Touch, Inc.)*, Nos. 02-91845, 04-6051, 2005 Bankr. LEXIS 1399, at *8-9 (Bankr. N.D. Ga. May 6, 2005).

As to the first factor, in assessing "closeness" for insider purposes, courts have considered whether the "parties maintained 'frequent' contact; testimony that demonstrated a close relationship; whether the parties had a personal friendship; whether the creditor had the ability to coerce the debtor to enter into transactions not in the debtor's interest; whether the parties shared the same office space; whether the creditor had actual control over the debtor; [and] whether the parties were involved in a joint venture to share profits." *Scarver v. M. Abuhab Participacoes S.A. (In re Moskowitz)*, Nos. 10-73348-WLH, 10-6650-WLH, 2011 Bankr. LEXIS 4800, at *14-15 (Bankr. N.D. Ga. Nov. 28, 2011) (citations omitted). The Trustee argues Delta had a sufficiently close relationship with Debtor vis a vis Lucas to qualify as an insider.

Defendants assert Jaffer and Luthra's friendship with Lucas is not sufficient to render Delta a non-statutory insider of Debtor. The Court disagrees. Jaffer and Luthra both testified on more than one occasion that they were good friends with Lucas. Lucas and Luthra were not just "good drinking buddies," their families spent time together. But this closeness went beyond mere friendship as evidenced by: Jaffer and Luthra encouraging Lucas to start a new business in the lead up to Debtor's bankruptcy, offering a rent-free office to Lucas to start the new business, providing work to Lucas' newly formed entity Lucas Site after Debtor's bankruptcy despite Debtor still owing it $500,000 in

---

[32] As other courts have observed, these factors reflect the legislative history of 11 U.S.C. § 101(31), which provides that an "insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm[']s length with the debtor." *Carn v. Heesung PMTech Corp.*, 579 B.R. 282, 299 (M.D. Ala. 2017) (citing H.R. Rep. No. 95-595 at 312 (1977)).

unpaid commissions, Debtor making $20,000 worth of donations to nonprofits that Jaffer and Luthra were associated with, and Jaffer's nephew working for Debtor and Lucas Site. Further, Luthra and Jaffer actually thought, at one point, that Lucas was a partner in Delta. In addition, all of Delta's revenues during the relevant time period came from Debtor. In view of the above, the Court finds the parties had a sufficiently close relationship to qualify as non-statutory insiders. However, closeness alone is not sufficient. *Carl Zeiss Meditec AG v. Anstine (In re U.S. Med., Inc.)*, 370 B.R. 340, 345 (B.A.P. 10th Cir. 2007) (closeness by itself does not give rise to insider status); *Gordon v. Sec. Essentials, Inc. (In re Alpha Protective Servs.)*, 570 B.R. 897, 907 (Bankr. M.D. Ga. 2017).

Accordingly, the Court now turns to whether the transactions were at arm's length. When assessing whether transactions were at arm's length (or not), courts have looked to whether the transactions were documented, whether the parties were disinterested, whether the "transferee had the ability to influence or control the debtor," and whether the transferee is treated differently than other parties the debtor does business with. *See Scarver*, Nos. 10-73348-WLH, 10-6650-WLH, 2011 Bankr. LEXIS 4800, at *20-21 (citations omitted).[33] The evidence at trial demonstrated these transactions were far from arm's length. There were no formalities. There was no written agreement or other external evidence to describe the relationship between Delta and Debtor. Instead, it was a handshake deal based on the close relationship between Jaffer/Luthra and Lucas. There was no formula or methodology (in writing or otherwise) to determine how much Delta would be paid or when, and no mechanism to enforce the deal. Jaffer and Luthra would get Debtor a job, and Delta would take back some of Debtor's profit (a fair amount as determined by Luthra) as a commission. Debtor also had a business dependence on Delta. Indeed, Jaffer and Lucas apparently channeled $15-

---

[33] There is no clear test for assessing the arm's length nature of a transaction for insider analysis purposes. As observed by the Supreme Court, the "stock judicial method is to merely to state the requirement of such a transaction and then to do the fact-intensive job of exploring whether, in a particular case, it occurred." *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 968 (2018).

20 million of work to Debtor over the years. Debtor and Lucas were in a situation where they needed to keep Jaffer and Luthra happy because they were providing Debtor with work. This relationship was more akin to a joint venture or an investment. There was also no clear testimony on what projects the commissions came from or any methodology for applying the payments that came in for any particular job. Delta's bank statements, general ledger, and the checks from Debtor are the only paper records of the business relationship between the parties. Further, Debtor did not schedule its debt to Delta and Delta did not file a claim in Debtor's bankruptcy for the $500,000 in "bad debt" listed on its general ledger that Debtor owed it. Based on these facts, the Court finds Debtor and Delta's business relationship was not conducted at arm's length and the second factor is established.

The Court concludes Debtor's relationship with Delta is the type that merits extra scrutiny and accordingly finds Delta is a non-statutory insider of Delta. In the six months prior to Debtor's bankruptcy, it paid $450,000 on a debt to Delta that had no repayments terms, that lacked an enforcement mechanism, and all to an entity it was dependent on for its livelihood. It was based on a handshake deal which under the circumstances show the Transfers were driven by affinity and friendship (in addition to the business relationship). This gave Delta an unfair relational advantage over other creditors, making the one-year look back period for preferential transfers appropriate.

Accordingly, the Court finds and concludes Delta was an insider of Debtor at the time of the Transfers. The Court will schedule a further trial on the remaining issues in this adversary proceeding.

###

Clerk's office to serve.